UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X

AXEL MONTALVO,                                          24-CV-00445(GTS)(MJK)

                                    Plaintiff,          JURY TRIAL
                                                        DEMANDED
              -against-
                                                        **FIRST AMENDED**
                                                        **COMPLAINT**

THE STATE OF NEW YORK; NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND COMMUNITY
SUPERVISION; ANTHONY ANNUCCI (in his individual        ECF CASE
and official capacity); CHIEF MEDICAL OFFICER  CARL
KOENIGSMANN, MD (in his individual and official
capacity); CHIEF MEDICAL OFFICER JOHN MORLEY,
MD (in his individual and official capacity); CHIEF
MEDICAL OFFICER DOE, MD (in their individual and
official capacity); CHIEF MEDICAL OFFICER CAROL
MOORES, MD (in her individual and official capacity);
REGIONAL MEDICAL DIRECTOR JOHN T. HAMMER,
M.D. (in his individual and official capacity); REGIONAL
MEDICAL DIRECTOR PAULA BOZER, M.D. (in her
individual and official capacity); REGIONAL MEDICAL
DIRECTOR DAVID S. DINELLO, M.D. (in his individual
and official capacity); SHEHAB ZAKI, MD (in his individual
and official capacity); ROBERT DRUGER, MD (in his
individual and official capacity); JOHN DOE #1, MD; JOHN
DOE #2, MD; JANE or JOHN DOE #1-#2; JANE or JOHN
DOE, NP #1-#2; and JANE or JOHN DOE, PA #1-#2.

                                    Defendants.

------------------------------------------------------------------------------X

        Plaintiff AXEL MONTALVO by his attorneys, The Law Office of Christopher H.

Fitzgerald, brings this action against Defendant The State of New York, et. al and allege, based on

personal knowledge, information, belief, and the investigation of counsel, as follows:

# I. PRELIMINARY STATEMENT

1.     Plaintiff AXEL MONTALVO ("Plaintiff") brings this action against Defendant State of New York *et al.* for acts and omissions causing Plaintiff's permanent blindness in his left eye, and for failing to provide reasonable accommodations for his disability while detained at facilities of the Department of Correctional Services and Community Supervision ("DOCCS") at Marcy Correctional Facility ("Marcy"). These acts and omissions exhibit, *inter alia*, gross negligence, failure to properly train and supervise its employees, demonstrating deliberate indifference and wanton disregard for the impaired health of Plaintiff.

2.     Plaintiff brings this action for compensatory damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 1201 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §794 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

# II. JURISDICTION

3.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Eighth and Fourteenth Amendments to the United States Constitution. This action is also brought under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 1201 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §794. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

### III. VENUE

4.      Venue is proper for the United States District Court for the Northern District of New York, pursuant to 28 U.S.C. §§ 1391(a), (b), and (c) and § 1402(b) because it is the judicial district in which the events or omissions giving rise to Plaintiff's claim occurred.

### IV. JURY DEMAND

5.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

### V. THE PARTIES

6.      At all times hereinafter mentioned, Plaintiff was incarcerated at Marcy Correctional Facility, in Marcy, New York, County of Oneida. He was a detainee under the control of the State of New York Department of Correctional Services and Community Supervision ("DOCCS"). His date of birth is January 6, 1979.

7.      At all times hereinafter mentioned, Plaintiff was a "qualified individual" with a disability under the ADA and Rehabilitation Act in that he suffered from a chronic condition and was visually impaired to the extent that his ability to perform tasks of daily living and control his vision was impaired without significant medical monitoring and treatment.

8.      The State of New York ("STATE") is a proper party to this action pursuant to provisions of the Americans with Disabilities Act and §504 of the Rehabilitation Act (*see Kilcullen v. New York State DOL, 205 F.3d 77*).

9.      That at all times hereinafter mentioned, DOCCS is a department of the New York State government that operates and maintains the prisons and parole system statewide. DOCCS, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting, and

investigation of medical treatment of its medical staff. In addition, senior officials in DOCCS are aware of and tolerate practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten Department policies or customs. The Department is also responsible for the appointment, training, supervision, and conduct of all DOCCS personnel, including the Defendants referenced herein.

10.     At all times relevant hereto, Marcy Correctional Facility, is a medium security facility located at 9000 Old River Road, Oneida County, Marcy, New York 13403.

11.     At all times relevant hereto, upon information and belief, ANTHONY ANNUCCI ("ANNUCCI") is or was employed by DOCCS as Commissioner acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law, and at the time of the incident alleged herein, and perpetrated and/or supervised the medical neglect of Plaintiff. Defendant ANNUCCI is sued in his individual and official capacity.

12.     Up until late-2018, Carl Koenigsmann, MD ("KOENIGSMANN") served as the Chief Medical Officer ("CMO") for DOCCS. Defendant KOENIGSMANN is sued in his individual and official capacity.

13.     From late-2018, up until mid-2020, John Morley, MD ("MORLEY") served as the CMO for DOCCS. Defendant MORLEY is sued in his individual and official capacity.

14.     From mid-2020 through July 2020, CMO DOE served as the CMO or Acting CMO for DOCCS. Defendant CMO DOE is sued in their individual and official capacity.

15.     Carol Moores, MD ("MOORES") currently serves as CMO for DOCCS. She started that role in July 2022. Defendant MOORES is sued in her individual and official capacity.

16.     At all times relevant hereto, on information and belief, Paula Bozer, MD ("BOZER") is a Regional Medical Director ("RMD") and a treating physician at DOCCS who served on the Policy Review committee for DOCCS which oversees the development and necessary changes to medical policies. Defendant BOZER is sued in her individual and official capacity.

17.     At all times relevant hereto, on information and belief, JOHN T. HAMMER, M.D is or was employed by DOCCS as a RMD and treating physician, also responsible for the oversight of the medical care provided to incarcerated individuals at MARCY, acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law, and at the time of the incident alleged herein, and perpetrated and/or supervised the medical neglect of Plaintiff. Defendant HAMMER is sued in his individual and official capacity.

18.     At all times relevant hereto, on information and belief, David S. Dinello, MD ("DINELLO") was an RMD and treating physician at DOCCS. Dinello was Chairman of the Pharmacy and Therapeutic Committee for DOCCS. He is sued in his individual and official capacity.

19.     At all times relevant hereto, SHEHAB ZAKI, MD is or was employed by DOCCS as a physician at MARCY, acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law. Defendant ZAKI worked at MARCY at the time of the incidents alleged herein, and was a party to the medical neglect of Plaintiff. Defendant ZAKI is sued in his individual capacity.

20.     At all times relevant hereto, Robert Druger, MD ("DRUGER") is a physician and Ophthalmologist who works for DOCCS at Walsh Medical Unit at Mohawk Correctional Facility

acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law. Defendant DRUGER worked at MARCY at the time of the incidents alleged herein, and perpetrated the medical neglect of Plaintiff. Defendant DRUGER is sued in his individual capacity.

21.     At all times relevant hereto, JOHN DOE #1, MD is or was employed by DOCCS as a physician at MARCY acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law.

22.     At all times relevant hereto, JOHN DOE #2, MD is or was employed by DOCCS as a Physician at MARCY acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law.

23.     At all times relevant hereto, JANE DOE #1, MD is or was employed by DOCCS as a Physician at MARCY acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law.

24.     At all times relevant hereto, JANE DOE #2, MD is or was employed by DOCCS as a Physician at MARCY acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law.

25.     At all times relevant hereto, JOHN DOE #1, NP is or was employed by DOCCS as a Nurse Practitioner at MARCY acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law.

26.     At all times relevant hereto, JOHN DOE #2, NP is or was employed by DOCCS as a Nurse Practitioner at MARCY acting in the capacity of agent, servant, and employee of

Defendant STATE, within the scope of his employment as such, and acting under color of state law.

27.     At all times relevant hereto, JANE DOE #1, NP is or was employed by DOCCS as a Nurse Practitioner at MARCY acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law.

28.     At all times relevant hereto, JANE DOE #2, NP is or was employed by DOCCS as a Nurse Practitioner at MARCY acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law.

29.     At all times relevant hereto, JOHN DOE #1, NP is or was employed by DOCCS as a Physician Assistant at MARCY acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law.

30.     At all times relevant hereto, JOHN DOE #2, NP is or was employed by DOCCS as a Physician Assistant at MARCY acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law.

31.     At all times relevant hereto, JANE DOE #1, NP is or was employed by DOCCS as a Physician Assistant at MARCY acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law.

32.     At all times relevant hereto, JANE DOE #2, NP is or was employed by DOCCS as a Physician Assistant at MARCY acting in the capacity of agent, servant, and employee of Defendant STATE, within the scope of his employment as such, and acting under color of state law.

33.     That at all times relevant hereto, the defendant Medical Staff – Medical Director, Physicians, Nurse Practitioners, and Physician Assistants – were acting within the scope and course of their employment.

## VI.     STATEMENT OF FACTS

### Glaucoma Diagnosis and Initial Treatment

34.     On July 5, 2018, Plaintiff was transferred to MARCY. At that time Plaintiff's only diagnosed health issues were hypertension and asthma.

35.     On or around November 1, 2018, during a routine checkup with an Optometrist for prescription eyeglasses, Plaintiff was told that the pressure in his left eye was "extremely high." The Optometrist told Plaintiff that he required emergency surgery to reduce the pressure and prescribed Latanoprost and Timdol to control and lower the pressure within both eyes.

36.     Glaucoma is a chronic disease that causes fluid to build up in the eye. The increased pressure damages the optic nerve.

37.     Upon information and belief, Plaintiff's prescription of Latanoprost and Timolol specified that he was to administer them himself daily and to not miss a dose.

38.     Both Latanoprost and Timolol were classified as "self-carry" medications and required Plaintiff to pick up the prescriptions from the prison Pharmacy.

39.     Plaintiff's prescription instructed him, upon waking up, to apply drops to each eye every fifteen minutes for the first two hours of the day and then once at night before going to sleep.

40.     On May 15, 2019, Plaintiff was referred to an eye specialist by Defendant ZAKI.

41.     On or around November 12, 2019, approximately six months after the May 15, 2019 appointment, Plaintiff was taken to the Walsh Medical Unit at Mohawk Correctional Facility to be evaluated by Defendant DRUGER, an Ophthalmologist.

42.     During DRUGER's evaluation, the intraocular pressure of both of Plaintiff's eyes were checked. The evaluation confirmed Plaintiff's Glaucoma diagnosis. Dr. Druger's note following the appointment indicates that the Glaucoma was stable.

43.     At this appointment, a follow up appointment within six months was requested by DRUGER to check Plaintiff's intraocular pressure again.

44.     The "Request and Report of Consultation Form" dated November 13, 2019 indicates the follow up appointment would be scheduled before May 15, 2020.

45.     At the appointment with DRUGER, Plaintiff's prescriptions for Latanoprost and Timolol were renewed.

46.     Upon information and belief, DRUGER told Plaintiff that the prior dosages prescribed were incorrect and that Plaintiff required surgery at his next visit to stop fluid from building up inside his left eye.

47.     Plaintiff was seen by the Optometrists at Walsh Medical Unit several times following the initial visit, but surgery was never scheduled or performed.

48.     Up until May 2020, Plaintiff's prescriptions would run out before being refilled several days later.

49.     In May 2020, Plaintiff stopped receiving his prescription for Latanoprost. Latanoprost is prescribed to treat elevated intraocular pressure. Thus, Plaintiff was only receiving his prescription for Timolol.

50.     Upon information and belief, Plaintiff's prescription was modified without explanation from, evaluation by, or consultation with, a physician.

51.     For almost a year, from May 2020 through April 23, 2021, Plaintiff's glaucoma was not monitored by a physician or optometrist.

52.     Between November 2019 and April 2021, Plaintiff's intraocular pressure was not checked by a physician or optometrist.

53.     Plaintiff frequently submitted medical slips requesting a medical visit due to discomfort, pain and declining vision in his left eye.

**Plaintiff's Loss of Vision in His Left Eye**

54.     On or about April 22, 2021 Plaintiff lost vision in his left eye. Plaintiff filled out a sick call slip hopeful that vision would return.

55.     On the morning of April 23, 2021, Plaintiff woke up to the realization that he could still not see out his left eye. He was seen by a nurse in the infirmary who put in a request for Plaintiff to see a doctor immediately.

56.     Three days later, Plaintiff was finally seen by ZAKI on April 26, 2021.

57.     The notes from this appointment indicate (1) the urgency of the request was "Routine," (2) that Plaintiff suffers from Glaucoma with Optic Atrophy in his left eye, (3) Plaintiff was originally scheduled to follow up with the Glaucoma Clinic in May 2020, (4) Plaintiff complaint that his vision has "gotten worse-especially that of his left eye, and (5) Plaintiff needs to be scheduled for an evaluation.

58.     ZAKI's referral for Plaintiff to be seen at the Glaucoma clinic indicates that the urgency of the request was "Routine." The status of the request was "Pending Facility Review."

59.     On April 29, 2021, a Registered Nurse, employed by Kepro Acquisition, Inc., ("Kepro"), contracted by DOCCS to review referral requests for "medical utilization" by DOCCS MDs and Mid-Level Clinicians "Pended" or delayed the referral request by Defendant ZAKI because the reviewer required additional information before the referral request could be approved. The stated reason was "Inappropriate Referral" and "Please change to GLA "Initial" D/T >1 Yr. Since Last seen by GLA."

### Diagnosed with Left Eye End State Traumatic Glaucoma

60.     Seventy-five (75) days later, on July 12, 2021, Plaintiff was finally taken to Upstate Medical Center in Syracuse, New York.

61.     Upon information and belief, Plaintiff was told during this appointment that the optical nerve in his left eye was damaged beyond repair.

62.     The Ophthalmologist's assessment revealed that Plaintiff's left eye pressure was 70. In addition, Plaintiff was developing glaucoma in his right eye.

63.     A procedure to relieve pressure inside his right eye was immediately scheduled.

64.     Plaintiff was re-prescribed the original combination of medications: Latanoprost and Timolol.

65.     On August 13, 2021, Plaintiff was seen by Jordan A Ueberroth, MD at Upstate Medical Center, University Center for Vision, in Syracuse. Dr. Ueberroth diagnosed Plaintiff's left eye condition as "severe stage" ocular trauma a result of glaucoma. Dr. Samuel Alpert performed a procedure to lower pressure in Plaintiff's eyes.

66.     Up until the time of the procedure, and after, plaintiff suffered extreme discomfort, pain, and headaches as a result of the dangerously high pressure in his eyes caused by his chronic glaucoma condition.

67.     Since Plaintiff lost vision in his left eye, he misjudges entrances to rooms and stairs, walks into walls and people. He spills liquids and food. In addition, he is unable to return to work in construction.

68.     Upon information and belief, following Plaintiff's vision loss, DOCCS medical staff began providing necessary medical care to other incarcerated-patients with vision issues.

**Denial of Access to Parole Eligible Program Due to Loss of Vision and Eye Condition**

69.     Plaintiff remained in DOCCS custody and continued to receive treatment for glaucoma of both eyes until his release on September 29, 2022.

70.     Upon information and belief, in January 2022, Plaintiff was eligible for parole if he successfully participated in an early-parole eligible DOCCS Program.

71.     Plaintiff was made ineligible for the program due to his chronic eye condition and the resulting pain, discomfort and the required self-administration of prescription medications for treatment of the condition.

72.     DOCCS did not provide Plaintiff with an alternative early-parole eligible program to provide Plaintiff an alternative path to become eligible for early parole. No time allowance was given to Plaintiff for good behavior.

73.     Plaintiff served all but two days of his full sentence.

74.     The willful neglect of Plaintiff's medical needs caused Plaintiff to needlessly lose vision in his left eye and the avoidable physical, emotional and psychological trauma. In addition, the denial of Plaintiff access to an early parole program due to his vision loss, prescription treatment requirements, and associated physical discomfort associated with chronic glaucoma and vision loss resulted in prolonged detention by DOCCS at MARCY.

## The Role of the Chief Medical Officer ("CMO")

75.     DOCCS is responsible for the confinement and rehabilitation of approximately 35,000 individuals in its custody at approximately 44 state facilities.

76.     DOCCS receives state and federal financial assistance.

77.     Neither the New York Department of Health nor any other entity provides oversight to DOCCS' medical treatment, other than relating to infectious diseases like tuberculosis or hepatitis C.

78.     DOCCS' medical administration effectively creates its own rules.

79.     The CMO is the ultimate arbiter of medical policy for DOCCS.

80.     CMO MORLEY was the ultimate arbiter of medical policy for DOCCS through late-2018. CMO DOE #1 served as CMO from late-2018 through July 2022. CMO MOORES started serving in July 2022.

81.     Though the CMO normally does not treat individual patients, the CMO is directly involved with DOCCS' Office of Counsel and the Attorney General's office when a patient sues DOCCS, often coordinating with RMDs, treating physicians, mid-level clinicians, and medical personnel on the facility level to review the patient's records and craft medical and legal responses. The CMO makes decisions that directly impact the health care of individual patients.

82.     MORLEY, DOE and MOORES were responsible for crafting policies and procedures for medical treatment of patients in DOCCS' custody, including overseeing primary care guidelines for treatment and medical health care policies, during their respective tenures.

83.     The CMO is charged with developing and regularly updating clinical practice guidelines in an effort to maintain consistency of care throughout the correctional setting and to stay current with scientific advances and community standards of treatment.

## The Role of Regional Medical Directors ("RMDs")

84. HAMMER, DINELLO, and BOZER were also responsible for crafting policies and procedures for medical treatment of patients in DOCCS' custody, including overseeing primary care guidelines for treatment.

85. HAMMER, DINELLO, and BOZER were responsible for developing and regularly updating clinical practice guidelines to maintain consistency of care throughout the correctional setting and to stay current with scientific advances and community standards of treatment.

86. Each RMD is responsible for a "hub." A DOCCS' medical hub is a group of correctional facilities within a region. There are five hubs within DOCCS.

## The Role of MDs and Mid-Level Clinicians

87. MDs and Mid-Level Clinicians are the Facility Health Services Directors, treating physicians and mid-level clinicians within DOCCS' 44 facilities.

88. The MDs and Mid-Level Clinicians are directly responsible for the healthcare of prisoners in the custody of DOCCS.

89. The MDs and Mid-Level Clinicians are directly responsible for examining patients during sick cal and scheduled examinations. Along with nurses, MDs and Mid-Level Clinicians respond to the medical complaints of patients regarding chronic pain, neurological, and other health issues.

90. The MDs and Mid-Level Clinicians are directly responsible for referring patients out for specialist diagnostic testing including MRIs, X-Rays, and intra-ocular pressure tests ("IOP") testing which assesses the pressure within incarcerated patient's eyes.

91. The MDs and Mid-Level Clinicians are directly responsible for prescribing medications available in the DOCCS' "Formulary Book" when patients require prescriptive care.

92. The DOCCS' "Formulary Book," lists all the medications available for doctors to prescribe without approval from an administrator.

93. The 2019 DOCCS' "Formulary Book," included Latanoprost and Timolol as a formulary medications.

94. The 2020 DOCCS' "Formulary Book," included Latanoprost and Timolol as a formulary medications.

95. The 2021 DOCCS' "Formulary Book," included Latanoprost and Timolol as a formulary medications.

96. The 2022 DOCCS' "Formulary Book," included Latanoprost and Timolol as a formulary medications.

97. To prescribe, a provider "requires a diagnosis on the prescription."

### The Role of Consultants and Specialty Medical Providers

98. MDs and Mid-Level Clinicians are directly responsible for submitted referrals for patients to outside consultants and specialists when MDs and Mid-Level Clinicians are not skilled or experienced enough to diagnose or treat specific conditions.

99. DOCCS Health Services Policy states, "Referrals for outpatient care will be requested only when necessary medical assessment and treatment services are not available from facility primary care providers.

100. To facilitate a Referral, an MD or Mid-Level Clinician submits a "Request and Report of Consultation" ("Referral") that includes a synopsis of the patient's particular medical issue drafted by the referring medical provider on the facility level and the reasons he/she believes a visit with a specialist is necessary.

101.     DOCCS' outside quality control provider, Kepro Acquisitions Inc. ("Kepro"), then reviews the specialty appointment request and approves or denies it. If denied an RMD can override the denial.

102.     Kepro "provide[s] utilization review of medical services received by incarcerated individuals to determine if services provided were within the standard guidelines for care. This provides an independent review of medical services provided to the incarcerated population" DOCCS is "mandated to provide appropriate medical care" pursuant to the Eighth Amendment to the U.S. Constitution, which prohibits cruel and unusual punishment."

103.     At the appointment, the specialist then fills out his/her findings on the bottom half of the "Referral," generally in hand. Sometimes the specialist attaches his/her computer-generated report. The specialist report is then given to the MDs and Mid-Level Clinicians for review.

104.     The MDs and Mid-level Clinicians personally review the reports and recommendations of specialists who treat patients.

105.     To record the fact that an MD or Mid-Level Clinician has reviewed the specialist report and recommendation, he/she initials the report with the date of review.

106.     The MD or Mid-level Clinician then makes a notation in the patient's health record regarding the findings and recommendations of the specialist.

107.     The MDs and Mid-Level Clinicians are directly responsible for prescribing specialist-recommended medications.

108.     Treating consultants or specialists have no ability to directly ensure prescriptions to DOCCS' patients, they can only make recommendations to the treating MDs and Mid-Level Clinicians through their reports.

109.     According to Division of Health Services Policy 3.02 "Medication Orders Within DOCCS Facilities," procedure, "Consultants [and/or Specialists] may recommend medication treatment

for inmates, but it is the responsibility of the Department's primary care provider to review the consultant's recommendations and determine the course of therapy. The facility prescriber may modify or decline the recommendations but **must document their reasons for doing so** in the Ambulatory Health Record."

**FIRST CLAIM FOR RELIEF:**
**Violation of the Eighth Amendment Prohibition against Cruel and**
**Inhumane Treatment in Denial of Necessary Medical Treatment,**
**(Against Defendants HAMMER, BOZER, DINELLO, DRUGER and ZAKI)**

110.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

111.    Defendants, acting under the pretense and color of law, permitted, tolerated, and were deliberately indifferent to Plaintiff's medical conditions.

112.    Plaintiff's glaucoma, diagnosed and/or confirmed by an agent of Defendant STATE, is a chronic, progressive eye disease that risks damage to the optic nerve, requires necessary treatment and significantly affects an individual's daily activities.

113.    Defendants had actual knowledge of the eye condition and disregarded excessive risk to Plaintiff's health and safety by:

(a) Monitoring of Plaintiff's glaucoma at a frequency of every six (6) months when the standard of medical care requires more frequent medical monitoring and maintenance;

(b) Discontinuing Plaintiff's prescription for Latanoprost medication without examining him or prescribing an effective alternative;

(c) Not scheduling Plaintiff for recommended surgery to reduce inter ocular pressure in his eyes;

(d) Allowing prescription eye drops to run out for several days before refilling them even though Plaintiff was warned to not skip doses.

(e) Not providing Plaintiff with emergency care, by a Physician for three days, after he lost sight in his left eye;

(f) Defendant ZAKI's referral of Plaintiff to a Specialist indicates the Referral Request was "Routine," not an Emergency, even though Plaintiff lost complete vision in his left eye.

114.    Defendants knew, yet intentionally failed and refused to provide treatment that would address Plaintiff's serious and necessary medical needs, knowing that those actions would result in Plaintiff's suffering and eventual blindness.

115.    Defendants caused the wanton infliction of pain upon Plaintiff with glaucoma and has exhibited deliberate indifference to the serious medical needs of Plaintiff.

116.    Defendants denied Plaintiff's necessary medical treatment and had actual knowledge of the risk to Plaintiff's health and safety which constitutes deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment to the United States Constitution's prohibition against cruel and inhumane treatment.

117.    Defendants, acting under the pretense and color of law, permitted, tolerated, and were deliberately indifferent to Plaintiff's medical conditions.

118.    As a result of the above tortious conduct, Defendants are liable for punitive damages.

119.    As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

**SECOND CLAIM FOR RELIEF:**
**Violation of Fourteenth Amendment Right to Substantive Due Process**
**(against Defendants ANNUCCI, KOENIGSMANN, MORLEY, CMO DOE,**
**MOORES, BOZER, DINELLO and HAMMER in their individual capacity)**

120.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

121.     Defendants ANNUCCI, KOENIGSMANN, MORLEY, CMO DOE, MOORES, BOZER, DINELLO and HAMMER were at all relevant times supervisors of the officers directly involved in this incident.

122.     Defendants ANNUCCI, KOENIGSMANN, MORLEY, CMO DOE, MOORES, BOZER, DINELLO and HAMMER knew that the pattern of medical and willful neglect described above existed in the State jails prior to and including the time Plaintiff received treatment for glaucoma and the symptoms of high interocular pressure. Their failure to take measures to ensure Plaintiff received medical treatment constitutes deliberate indifference to, and acquiescence in, the known unlawful behavior of their subordinates. The prevalence of these practices and general knowledge of their existence at the time of Plaintiff's medical needs, and the failure of these Defendants to take remedial action despite the fact that the denial of medical needs of incarcerated individuals-patients in State jails had been persistently brought to their attention, constitutes deliberate indifference to the medical needs of incarcerated individuals-patients in their care and custody, including Plaintiff. These Defendants' conduct has been a substantial factor in the continuation of denial of medical care and a proximate cause of the constitutional violations alleged in this complaint.

123.     Defendants ANNUCCI, KOENIGSMANN, MORLEY, CMO DOE, MOORES, BOZER, DINELLO and HAMMER, and the other individual defendants had a reasonable opportunity to prevent the violation of Plaintiff's constitutional rights as described herein but they

refused to intervene. By failing to remedy the wrongs committed by their subordinates, in failing to properly train, screen, supervise, or discipline their subordinates, and by personally participating in the constitutional injuries set forth above, the Supervisory Defendants caused damage and injury in violation of Plaintiff's rights guaranteed under the United States Constitution, including its Fourth and Fourteenth Amendments, through 42 U.S.C. § 1983.

124. As a direct and proximate result of the Defendants' misconduct detailed above, Plaintiff sustained the damages hereinbefore alleged.

125. Accordingly, the individual defendants are liable to Plaintiff under the Fourteenth Amendment to the Constitution for failing to intervene to prevent the violation of Plaintiff's constitutional rights.

**THIRD CLAIM FOR RELIEF:**
**Americans with Disabilities Act,**
**42 U.S.C. § 12131 et seq.**
**(Against Defendant STATE and DOCCS)**

126. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

127. This claim is brought under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and 42 U.S.C. § 12131-12134, and its implementing regulations.

128. Plaintiff is a qualified individual with a disability as defined in the ADA because he was diagnosed with Glaucoma, a condition that substantially limits his ability to see, a physical impairment within the meaning of 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108(a), (b).

129. Plaintiff's physical impairment substantially limits one or more major life activities, including, but not limited to, seeing, caring for oneself, performing manual tasks, walking, concentrating, thinking and working. 42 U.S.C. § 12102(2)(A).

130.    Plaintiff has a record of having an impairment that substantially limits one or more major activity, as he has a history of such an impairment. 42 U.S.C. § 12102(1)(B).

131.    As a state prisoner, Plaintiff meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants. 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

132.    Plaintiff is regarded by STATE as having an impairment that substantially limits one or more major life activity as DOCCS staff, or other STATE agents, perceive Plaintiff as having such an impairment. 42 U.S.C. § 12102(1)(A), (3).

133.    Upon information and belief, Defendants STATE and DOCCS regularly and habitually failed in their obligations to Plaintiff by allowing prescriptions to run out, failing to prescribe medications at correct dosages, failing to provide Plaintiff with Latanoprost as prescribed by his treating Ophthalmologist, and upon learning that Plaintiff had lost vision in his right eye, failing to take emergency action by providing Plaintiff with emergency care, but to have him seen by a Doctor three days later and a specialist 75 days later.

134.     Defendants failed to accommodate his disability and provide access to programs and services in at least the following areas: educational, vocational, work, grievance, disciplinary proceedings and health services. 42 U.S.C. § 12131(2).

135.    Further, and despite the fact that Plaintiff had no disciplinary history while in custody, Defendants extended his time of incarceration because he could not participate in a physically demanding early parole program because of his blindness—the very condition caused by Defendants' willful neglect of his medical needs.

136.     Because only able-bodied detainees were permitted to participate in the early parole program, Defendants' policy categorically discriminated against detainees with disabilities by failing to provide reasonable alternative accommodations.

137.     Defendants discriminated against Plaintiff on the basis of his vision disability in violation of 42 U.S.C. § 12132.

138.     Defendants are agents or officials of public entities and or public entities as that term is defined in 42 U.S.C. § 12131(1)(B).

139.     As a direct and proximate cause of these actions and omissions, Plaintiff has suffered from harm and violation of his ADA rights.

**FOURTH CLAIM FOR RELIEF:**
**Violations of Section 504 of the Rehabilitation Act,**
**(Against Defendant STATE and DOCCS)**

140.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

141.     Plaintiff is a qualified individual with a disability as defined by the Rehabilitation Act. He has glaucoma and is blind in one eye, which substantially limits the major life activity of seeing, and also affects other major life activities including reading, learning, performing manual tasks, walking and working.

142.     Plaintiff has a record of having such impairment and is regarded as having such impairment.

143.     As a state prisoner, Plaintiff meets the essential eligibility requirements for the receipt of services or the participation in programs or activities as provided by Defendant DOCCS. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

144. Defendants discriminated against Plaintiff solely on the basis of his disability by failing to accommodate his disability in denying access to prison educational, vocational, and grievance proceedings.

145. DOCCS receives federal financial assistance.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all of Defendants:

a. Compensatory damages;
b. Punitive damages;
c. The convening and empaneling of a jury to consider the merits of the claims;
d. Costs and interest and attorney's fees;
e. Such other and further relief as this Court may deem appropriate and equitable.

Dated: New York, NY
June 28, 2024

Respectfully submitted,

**The Law Office of
Christopher H. Fitzgerald**
*Counsel for Plaintiff*

_____/s/_____
Christopher H. Fitzgerald
*Attorney for Plaintiff*
AXEL MONTALVO
14 Wall Street, Suite 1603
New York, NY 10005
(212) 226-2275

_____/s/_____
By: Paul A. Stewart-Stand
*Attorney for Plaintiff*
AXEL MONTALVO
14 Wall Street, Suite 1603
New York, NY 10279
(212) 226-2275